## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

_____

In Re

PATRICIA CARLSON-CALLOW,

                **Debtor.**

| | |
|---|---|
| | **Bankruptcy Case No. 05-04260-JDP** |

_____

PATRICIA CARLSON-CALLOW,

                **Plaintiff,**

vs.

SALLIE MAE SERVICING, a
corporation, and EDUCATIONAL
CREDIT MANAGEMENT
CORPORATION, as successor
in interest to NORTHWEST
EDUCATION LOAN
ASSOCIATION, a corporation,

                **Defendants.**

**Adv. Proceeding No. 07-6030**

_____

## MEMORANDUM OF DECISION
_____

MEMORANDUM OF DECISION - 1

**Appearances:**

Randal J. French, BAUER & FRENCH, Boise, Idaho, Attorney for Plaintiff.

Thomas E. Dvorak, GIVENS PURSLEY, Boise, Idaho, Attorney for Defendants.

## Introduction

Plaintiff Patricia Callow contends that excepting her student loans from discharge in her bankruptcy case would subject her to undue hardship. In this adversary proceeding, she requests that the loans be discharged. *See* Complaint, Docket No. 1. Her student loan creditor, Educational Credit Management Corporation ("ECMC"), the successor in interest to Defendant Northwest Education Loan Association, opposes Plaintiff's request. *See* Answer, Docket No. 8.

The Court conducted a trial in this action on April 3, 2008. At its conclusion, counsel sought leave to submit closing briefs. The Court granted the request, and the parties made their submissions. Docket Nos. 37, 38, 40. After considering the evidence and testimony presented, the

MEMORANDUM OF DECISION - 2

arguments of the parties, and the relevant legal authorities, this

Memorandum constitutes the Court's findings of fact and conclusions of

law, and disposition of the issues.  Fed. R. Bankr. P. 7052.[1]


## I.  Facts

Plaintiff is sixty years old.  She has been married and divorced three

times.  Plaintiff resides in Boise, Idaho with her adult daughter.[2]  As

discussed below, Plaintiff is well-educated and employed, but ill.  Further

information concerning her health, education, and employment follow.

### A.    Plaintiff's Medical Condition

---

[1] Unless otherwise indicated, all chapter and section references are to the
Bankruptcy Code, 11 U.S.C. §§ 101 - 1330, and rule references are to the Federal
Rules of Bankruptcy Procedure, Rules 1001 - 9036, as they existed prior to the
enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of
2005 ("BAPCPA"), Pub. L. 108-9, 119 Stat. 23 (April 20, 2005), because Debtor's
bankruptcy case was commenced prior to BAPCPA's effective date of October
17, 2005.

[2] This daughter is the youngest of two from Plaintiff's second marriage, is
twenty-two years old and a full-time university student.  She has lived with
Plaintiff since December, 2006.  She pays no rent, but contributes $25.00 per
month for her food.

MEMORANDUM OF DECISION - 3

Plaintiff was born with Primary Ciliary Dyskinesia (PCD), a rare genetic disorder. This is a dysfunction of the cilia, a condition which prevents normal removal of mucus and other secretions from the body. In addition, Plaintiff has situs inversus, a condition in which most of her major organs are mirrored from their normal positions. Individuals with both PCD and situs inversus are said to suffer from Kartagener's Syndrome.

Plaintiff testified that because of her condition, she has been under a doctor's constant care since her youth. In addition, she has seen a specialist several times a year for the last eight years. Plaintiff testified that due to chronic bronchiectasis, a complication of PCD, she has difficulty breathing and frequently experiences coughing spells that progressively worsen throughout the day. She also testified that her lung capacity has steadily declined since birth, and it was recently measured at approximately 47% of what it should be for a healthy woman of her age. To cope with these and other symptoms, Plaintiff takes several prescription medications daily, and others as needed. In addition,

MEMORANDUM OF DECISION - 4

Plaintiff's doctors have advised her to use a chest PT vest, which is designed to dislodge the mucus from her lungs so that she can expectorate it.[3]  Plaintiff's impression is that her long-term prognosis was that her symptoms would persist and that her lung capacity would continue to decline.[4]

### B.    Plaintiff's Education

During Plaintiff's second marriage, her husband lost his job, and she and her husband moved to Moscow, Idaho so that he could pursue a law degree.  While in Moscow, Plaintiff's husband encouraged her to return to

---

[3]  Although Plaintiff testified that her use of her prescribed PT vest was part of her daily routine, the reports prepared by her medical specialist admitted in evidence suggest otherwise.  In a September 6, 2007 report, the doctor noted that Plaintiff "has not been using her chest PT vest, but does have it available." Ex. 238.  In another report, dated January 28, 2008, the doctor explains "[a]s usual [Plaintiff] is just not able to put use of her Chest PT vest into her daily routine." Ex. 239.

[4]  While the Court does not doubt that Plaintiff's medical condition may deteriorate in the future, based on this record, the rate at which Plaintiff's health declines is uncertain and speculative.  However, Plaintiff's physician indicated in her reports that Plaintiff understands that if she would regularly use her chest PT vest, she would likely preserve her lung function longer.  *See* Ex. 239.

MEMORANDUM OF DECISION - 5

school to finish her degree.  In 1987, she enrolled in the animal science

program at the University of Idaho.

Upon completing her bachelor's degree, Plaintiff could not

immediately find work in her field.  Acting upon her professor's

recommendation, she elected to continue her education.  In 1991, she

completed her master's degree in agricultural economics.

Only limited testimony was offered to explain how Plaintiff

financed her education.  However, it appears that her schooling was

funded almost entirely with student loans.  During the time Plaintiff and

her former husband were in college, she participated in some work-study,

but her husband was not employed.

During the course of Plaintiff's education, she obtained seventeen

separate student loans, totaling $47,773.  Ex. 207.  Then, in April 1994,

three years after Plaintiff completed her master's degree, she obtained a

consolidation loan in the amount of $52,952.  *Id*.  Nearly seven years later,

MEMORANDUM OF DECISION - 6

in March 2001, Plaintiff received a second consolidation loan in the

amount of $88,776.[5]  *Id*.

Plaintiff's schedule F, filed with her bankruptcy petition on October

6, 2005, listed a balance due on the loans of $106,559.  Prior to this

adversary proceeding, that balance had climbed to approximately

$123,070.39, with interest accruing at 8.25% per annum.  *See* Complaint,

Docket No. 1.

However, prior to the trial date, ECMC filed a pleading in the

adversary proceeding wherein it represented that, pursuant to its statutory

authority under 34 C.F.R. § 682.402(i)(1)(v), it had elected to voluntarily

reduce the amount due from Plaintiff on her loans to approximately

$88,000, and had adjusted the interest rate from 8.25% to 5%.  As of March

24, 2008, Plaintiff owed $88,909.68 on her student loans.  Docket No. 38.

### C.    Plaintiff's Employment History

---

[5]  Plaintiff testified that this second consolidation loan was necessary because one of her initial loans was inadvertently omitted from her previous consolidation loan.  The following handwritten note appears on the loan application:  "All other loans have been consolidated – This ~~was~~ one was overlooked."  Ex. 216 (strikeout in original).

MEMORANDUM OF DECISION - 7

After graduating with her master's degree, Plaintiff sought employment in her chosen field with several companies, but was unsuccessful.  She testified that an agent from one potential employer told her that it expected she would have had more work experience in agricultural economics for a person with her educational background, and that it was not hiring entry level positions.

Unable to secure a job in her chosen field, Plaintiff began doing clerical work in her husband's law office.  When her second marriage dissolved, she sought work with various temporary employment agencies doing clerical work.  She testified that she attempted to find jobs commensurate with her education, but that she received very little response to the letters and resumes she distributed.[6]

In 2000, Plaintiff obtained employment in an accounting division at Boise Cascade.  In late 2003, she learned that Boise Cascade was going to

---

[6] Exs. 110-120 are copies of the letters and applications which Plaintiff sent to various employers.

MEMORANDUM OF DECISION - 8

be sold, and she began casually looking for new employment.[7]  In

February, 2005, her division at Boise Cascade was closed, and as a result,

Plaintiff was terminated.[8]

In early March, 2005, Plaintiff accepted a position as an associate in

the accounting/finance division of Resources Global Professionals

("RGP"), where she continues to work today.  RGP is an international

professional services firm with more than 80 offices.  According to the

managing director of RGP's Boise office, its associates are deployed on

"projects" with RGP clients.  The length of time spent on each project

depends upon the complexity of the assignment and the needs of the

client.  The manager testified that RGP requests that its clients give it a

---

[7]  Exs. 122-129 outline Plaintiff's attempts to secure new employment.
These exhibits contain copies of correspondence with several employers, and list
over 30 job descriptions for available positions.  Counsel stipulated that for each
job description listed, Plaintiff completed and submitted an application for
employment to the employer.

[8]  While employed at Boise Cascade, Plaintiff made contributions to a
401(k) plan.  Upon termination, her contributions were rolled over into an
annuity.  Plaintiff testified that the approximate value of the annuity is $26,000,
but it fluctuates in response to stock values.  In addition, Plaintiff became eligible
for a small pension, which she can begin receiving at age 66.  The pension
payments will be approximately $200 per month.

MEMORANDUM OF DECISION - 9

two-week courtesy notice when a project nears completion, at which time

RGP begins searching for a new project which matches the particular

associate's skill set.  Although the witness testified that every effort is

made to assign the associate to a new project at the conclusion of the

former, it is not always possible to do so, and there are times when an

associate is left without work with RPG for a time.

Plaintiff is currently working on her second project, where she is

assigned to Washington Group International.  Initially, Plaintiff

understood that this project might last three or four months; however, her

work on this project has continued through to the present time.[9]  Plaintiff

testified that she is unsure when the project will be complete, however, she

suspects it may end in July 2008.

When Plaintiff began working at RGP in 2005, she earned $21.00 per

hour.  She has since received two raises.  In June, 2006, her wage was

raised to $28.00 per hour, and then in November, 2007, it was raised again

---

[9]  According to the confirmation letter in RGP's personnel file, Plaintiff
began work on this project on June 23, 2005.  Ex. 109.  The approximate length of
the assignment was listed as "5 weeks or as needed."  *Id.*

MEMORANDUM OF DECISION - 10

to $30.00 per hour.  The manager testified that it is RGP's intent to keep

Plaintiff's wage at the same level for her next project, but he could not

guarantee that would occur.

In addition to her full-time employment with RGP, Plaintiff invests

approximately 15 hours per week in Firebug Designs, a fused-glass

business she started in 2005 with her eldest daughter, Chelsea.[10]  Plaintiff

testified that she embarked upon this new business venture in part to

supplement her income during the "downtime" between projects at RGP.[11]

Together, Plaintiff and her daughter design, manufacture and sell jewelry,

decorative bowls, wall art, and other custom creations with fused glass.

They sell their products on the internet, at one retail shop in downtown

Boise, and at farmers' markets and art shows throughout Idaho.

---

[10]  Chelsea is twenty-eight and resides away from home.  Chelsea works
full-time as a book keeper and loan processor.  Plaintiff and Chelsea each have a
50% interest in Firebug Designs.

[11]  The evidence suggests that "supplementing" RGP income was not the
only reason Plaintiff started Firebug Designs, as the business was in fact started
prior to Plaintiff's hire date at RGP.  *See* Ex. 240 (listing multiple business
expenses incurred prior to March 7, 2005, the effective date of Plaintiff's
employment at RGP).

MEMORANDUM OF DECISION - 11

After three years of operation, the business has yet to realize any profit.[12]  Plaintiff testified that while she and her daughter do not have a formal business plan, they intended to pursue this venture for five years to attempt to make Firebug Designs profitable.  The success of the business will be a challenge to achieve, in part because it appears from the evidence that its operations are financed almost entirely with credit cards.

## II.  Discussion

In general, educational loans made, insured, or guaranteed by the government are not discharged in bankruptcy "unless excepting such debt from discharge . . . will impose an undue hardship on the debtor and the debtor's dependents."  11 U.S.C. § 523(a)(8).  The term "undue hardship" is not defined in the Bankruptcy Code, but the Ninth Circuit has recognized that "'[t]he existence of the adjective "undue" indicates that

---

[12]  Plaintiff testified that in 2005, 2006, and 2007, Firebug Designs suffered business losses of approximately $28,000, $27,000, and $25,000 respectively.  Her tax returns for those same years reflect her ½ share of that loss, being $14,173, $13,701, and $12,516.  Exs. 204, 205, 206.

MEMORANDUM OF DECISION - 12

Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans . . . .'" *United Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1111 (9th Cir. 1998) (quoting *Brunner v. New York State Higher Educ. Servs. Corp. (In re Brunner)*, 46 B.R. 752, 753 (Bankr. S.D.N.Y. 1985), *aff'd*, 831 F.2d 395 (2d Cir. 1987)).

To determine if excepting student loan debt from discharge will impose an undue hardship, the Ninth Circuit has adopted the three-part test first enunciated in *In re Brunner*, 831 F.2d at 396. *See In re Pena*, 155 F.3d at 1112 (adopting the *Brunner* test). Under the *Brunner* test, to discharge a student loan debt, the debtor must prove that: (1) she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if required to repay the loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period; and (3) the debtor has made good faith efforts to repay the loans. *Educ. Credit Mgmt. Corp. v. Mason (In re Mason)*, 464 F.3d 878, 882 (9th Cir. 2006); *In re Brunner*, 831 F.2d at 396.

MEMORANDUM OF DECISION - 13

The debtor bears the burden of proving all three elements in order to obtain a discharge of an educational debt. *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1087-88 (9th Cir. 2001); *United Student Aid Funds, Inc. v. Nascimento (In re Nascimento)*, 241 B.R. 440, 445 (9th Cir. B.A.P. 1999); *Ritchie v. Nw. Educ. Loan Ass'n. (In re Ritchie)*, 254 B.R. 913, 917 (Bankr. D. Idaho 2000). Although the standard to obtain a discharge of student loans is high, it is not unattainable. *See Pa. Higher Educ. Assistance Agency v. Birrane (In re Birrane)*, 287 B.R. 490, 495 (9th Cir. B.A.P. 2002) ("In defining undue hardship, courts require more than temporary financial adversity, but typically stop short of utter hopelessness.")

Simply put, Plaintiff contends she should be able to discharge her student loan debts, and that she has shown by a preponderance of the evidence that she satisfies all three prongs of the *Brunner* analytical model. ECMC disagrees. Plaintiff's position is tested as the Court applies the *Brunner* elements, in turn, below.

MEMORANDUM OF DECISION - 14

### A.    Minimal Standard of Living

The first prong of the *Brunner* test focuses on the student loan debtor's situation at the time of trial.  *In re Pena*, 155 F.3d at 1112.  The precise method employed to calculate the debtor's reasonable monthly income and expenses is left to the discretion of the bankruptcy court.  *Id.* In applying this prong of *Brunner*, this Court has scrutinized debtors' proposed budgets to determine whether funds are available to make payments on the student loan debt.  *See Delbridge v. ASFA Data Corp. (In re Delbridge)*, 03.2 I.B.C.R. 112, 113 (Bankr. D. Idaho 2003).

In preparation for trial, Plaintiff prepared two comprehensive spreadsheets containing estimates of her monthly income and expenses. These documents, Exs. 139 and 140, were admitted at trial for demonstrative purposes only.  While these documents incorporate several assumptions with which the Court disagrees, they provide an appropriate matrix for the Court to begin its analysis.

MEMORANDUM OF DECISION - 15

### 1.   Income

Plaintiff estimates her gross income over the next year to be between $50,700 and $53,820.[13] *See* Exs. 139, 140. Plaintiff testified that she currently works between 38 and 39 hours per week. Plaintiff's projections assume she will continue to work 39 hours per week.

Next, aside from her current project, Plaintiff's estimates assume that she will be assigned to two additional RGP projects this year. She predicts she will work a total of thirty weeks on her current project, nine weeks on her second project, and seven weeks on her third project. Plaintiff anticipates she will be unemployed during six weeks out of the year. Other than representing her best guess, Plaintiff did not explain how she arrived at these assumptions, and there is no other basis in the record to corroborate how many additional projects she will be assigned by RGP,

---

[13] Plaintiff employs a range of hourly wages to arrive at this estimate. In Ex. 139, Plaintiff assumed she would continue to earn $30 per hour on her current project, but that she would earn only $25 per hour on any new RGP projects. In contrast, in Ex. 140, she assumed a $30 per hour wage for both her current project and all future projects. As discussed below, the Court finds that $30 per hour is a more appropriate figure.

MEMORANDUM OF DECISION - 16

or how long those projects might last.[14]  Absent some credible foundation,

Plaintiff's estimates of her future income are therefore speculative.

While Plaintiff's attempts to depict an accurate estimate of her *future*

income are laudable, they are unnecessary for the purposes of the *Brunner*

analysis.  "[A] determination of income for § 523(a)(8) purposes must be

based on *current* income."  *In re Pena*, 155 F.3d at 1111 (emphasis added);

*Twitchell v. Educ. Credit Mgmt. Corp. (In re Twitchell)* 04.2 I.B.C.R. 66, 67

(Bankr. D. Idaho 2004).  Accordingly, the Court need not speculate about

future events regarding Plaintiff's employment in the months to come.

Instead, as the case law instructs, the Court should determine Plaintiff's

monthly income based on circumstances as they currently exist.

Based on the evidence, the Court finds that Plaintiff's gross monthly

income amounts to  $4,940.[15]

---

[14]  With respect to the hourly wage, however, the RGP manager testified
that it was the company's intention that Plaintiff's wage remain unchanged with
any new assignments, although he could not guarantee that would indeed occur.

[15] The calculations used to arrive at this figure are as follows:  $30 per hour
x 38 hours per week x 52 weeks per year = $59,280 annually.  $59,280 per year / 12
months = $4,940 per month.

MEMORANDUM OF DECISION - 17

### 2.      Expenses

As with income, a debtor's expenses are examined as they currently

exist.  *In re Pena*, 155 F.3d at 1111.  However, where expenses fluctuate, it is

proper for a bankruptcy court to average the figures.  *Id.* at 1112 ("where

the evidence suggests that the debtor's income or expenses tend to

fluctuate, it is not inappropriate to average figures over a reasonable

period of time.").  Most of the expense entries in Plaintiff's projections, Exs.

139 and 140, are based upon the average amount she spent in each

category over the six months preceding the trial.  However, at trial,

Plaintiff explained that some figures, such as that for her second mortgage,

food, and automobile gas, had been adjusted upward from the average

amounts spent.  ECMC objects to the propriety of several of these

expenses, and to some of Plaintiff's methods.  Apart from ECMC's

objections, the Court views some of the other expenses claimed by Plaintiff

with skepticism.  In the exercise of its discretion, the Court will adjust

those expenses which it deems unreasonable under the circumstances, and

eliminate others which it finds are unnecessary for Plaintiff to maintain a

MEMORANDUM OF DECISION - 18

minimal standard of living.  *See In re Pena*, 115 F.3d at 1113; *In re Delbridge*, 03.2 I.B.C.R. at 113.

Historically, Plaintiff has contributed 8% of her gross income to a 401(k) plan at RGP.[16]  Given a monthly income of $4,940, Plaintiff's monthly contribution to her 401(k) is $395.20.  In addition, Plaintiff participates in RGP's employee stock purchase plan, which requires a contribution of 3% of her monthly gross income, or $148.20.  Plaintiff is also repaying a loan which she took from her 401(k) plan to pay for expenses associated with Firebug Designs.[17]  ECMC objected to each of these expenses, arguing they evidence that Plaintiff enjoys more than a

---

[16]  This figure represents a 6% standard contribution and a 2% "catch-up" contribution.

[17]  Payments on this loan are automatically deducted from Plaintiff's paycheck.  It is unclear precisely how much is still owing on the loan.  In Exs. 139 and 140, Plaintiff listed $71.41 as her monthly expense, but gave no indication as to when the loan would be repaid.  It is unclear how Plaintiff arrived at this figure, but based upon the Court's review of the evidence, it appears that this estimate is too low.  Each of the six pay stubs admitted into evidence list the loan repayment as $34.80.  To arrive at a precise monthly expense, the Court took this amount and multiplied it by the number of paychecks Plaintiff receives in one year and divided that amount by twelve.  Accordingly, $75.40 is the figure used in the Court's analysis.  ($34.80 per paycheck x 26 paychecks per year / 12 months = $75.40 per month).

MEMORANDUM OF DECISION - 19

minimal standard of living.  However, ECMC concedes that courts have

been willing, in certain circumstances, to allow a modest contribution by a

student loan debtor for retirement.  *See In re Twitchell*, 04.2 I.B.C.R. at 67.

Based upon these facts, the Court finds that it is reasonable to allow

Plaintiff to make modest contributions to help fund her retirement.

However, the $614.81 she currently uses for retirement-related expenses is

excessive.  In this case, the Court finds that Plaintiff's contributions to her

401(k) plan and her 401(k) loan repayment are reasonable, but her

contributions to the employee stock purchase plan must be excluded from

the analysis.

Plaintiff testified that she estimated her tax liability with the aid of a

software program, and those calculations are attached to Exs. 139 and 140.

Although the software program generated an estimated annual gross

federal tax liability, that figure was not used in Plaintiff's monthly budget.

Rather, like Plaintiff's payment advices, her tax expenses were separated

into the following categories: federal income tax, Idaho income tax, social

security (FICA), and medicare.  Next to each category, Plaintiff lists a

MEMORANDUM OF DECISION - 20

percentage.[18]  Plaintiff did not explain how she calculated the various

percentages, however, her monthly expense in each category is simply that

percentage of her estimated monthly income.

As previously explained, Plaintiff's estimated monthly income, as

listed in Exs. 139 and 140, is not the correct figure for the purposes of the

*Brunner* analysis.  Because Plaintiff's tax expenses are derivative of that

figure, they are also incorrect.  More appropriate figures for Plaintiff's tax

expenses can be obtained by taking her current withholdings from each

paycheck and converting them into a monthly figure.  Accordingly, for the

purposes of this analysis, Plaintiff's monthly expenses for federal income

tax, social security (FICA), medicare, and Idaho income tax are $381.72,

$277.81, $64.98, and $199.33, respectively.[19]

---

[18]  The percentage used for each category varies from Ex. 139 to 140.  In Ex.
139, for her federal, state, social security, and medicare withholdings, Plaintiff
lists 8.72%, 4.55%, 5.75%, and 1.45%, respectively.  However, in Ex. 140, for those
same categories, Plaintiff lists 9.05%, 4.76%, 5.75%, and 1.45%, respectively.

[19]  Proper calculations begin with Plaintiff's payment advice for the period
ending January 5, 2008 because it is based upon the same criteria used to find
Plaintiff's current monthly income, *i.e.*, a work week of 38 hours and a rate of $30
per hour.  Ex. 237.  To convert the tax withholdings to a monthly figure, the
amount for this pay period is multiplied by 26, the number of pay periods in a

MEMORANDUM OF DECISION - 21

At trial, Plaintiff acknowledged that the minimum payment required to service her second mortgage was $100 per month, but that her projections include a payment of $176.  Plaintiff cited no legal authority to support her desire to increase her monthly mortgage payments.  Instead, she justifies this approach by arguing that the increase is necessary in order for her to pay off the mortgage debt by the time she retires, which she predicts will occur when she reaches age sixty-six.  Although Plaintiff's strategy has some logical appeal, the Court concludes that, in this context and under *Brunner*, sanctioning a voluntary increase in monthly mortgage payments can not be supported.  The Court's analysis will therefore assume Plaintiff continues to make the minimum monthly mortgage payments of $100.

---

year, and then divided by 12 months.  Accordingly, Plaintiff's monthly tax withholdings are as follows: federal income tax is $176.18 x 26 / 12 = $381.72; social security is $128.22 x 26 / 12 = $277.81; medicare is $29.99 x 26 /12 = $64.98; and Idaho income tax is $92 x 26 / 12 = $199.33.

MEMORANDUM OF DECISION - 22

Plaintiff claims a monthly expense in her budget of $106.22 for cable television and internet services.[20]  The Court harbors considerable doubt, even in this electronic age, whether these services are truly essential to maintain a minimal standard of living in all circumstances.  However, the Court also recognizes that Plaintiff utilizes the internet to sell the products she creates in her business.  Under these facts, allowance of a small sum is permissible for these services.  The $106.22 Plaintiff requests is excessive, however, and the Court finds that this expense should be reduced to $50 per month.

Plaintiff itemizes several expenses which appear to the Court to constitute financial support for her 22-year old daughter living with Plaintiff.  Plaintiff contributes $18 per month for her daughter's auto insurance, and $9.99 per month for her daughter's cell phone.  Although necessary expenses related to the support of a minor child or dependant

---

[20]  Ex. 230 is the first page of Plaintiff's bill from Cable One.  It confirms that the monthly service and taxes amount to $106.22, but does not indicate which service package Plaintiff subscribes to.  Plaintiff testified that her cable service is one step up from the basic service.

MEMORANDUM OF DECISION - 23

are proper, this Court has held that rendering financial assistance for an adult child is not. *See, e.g., In re Delbridge*, 03.2 I.B.C.R. at 13 (debtor's voluntary contribution to support her brother, to whom she had no legal obligation, is not "properly included in the minimal standard of living analysis."); *see also, In re Williams*, 301 B.R. 62, 73 (Bankr. N.D. Cal. 2003) ("This court has found no support for the notion that a minimal standard of living under the first prong of the *Brunner* test should include voluntary assumption of non-dependant family members' expenses without a legal obligation to do so."). Plaintiff's arguments do not persuade the Court to modify its prior reasoning in this case, and thus Plaintiff's proposal to continue to pay the expenses related to her adult daughter will be disregarded in the Court's analysis.

Plaintiff's budget lists payments she makes for three life insurance policies. The first policy appears to be provided through her employment, and approximately $34 per month is deducted from her paycheck on this account. The second and third policies are listed in her budget as "AFBA" and "USAA" with monthly payments of $33 and $22.04 respectively.

MEMORANDUM OF DECISION - 24

Plaintiff testified that one of these policies insures her former husband's life, but that her daughters are the beneficiaries. While maintaining life insurance is reasonable under these circumstances, paying for three separate policies while discharging significant student loan debt is not, especially when the beneficiaries of the policies are Plaintiff's adult children. Plaintiff's expenses will be further reduced by $55.04 per month.

Plaintiff's budget has five separate expense entries related to Firebug Designs. The first four entries are separate credit cards which Plaintiff has used since her bankruptcy petition to pay operational expenses associated with her business.[21] The last entry is her estimated out-of-pocket expenses for Firebug Designs in the coming months.[22]

These business expense items are problematic. Based on the record, it is abundantly clear that Firebug Designs has, thus far, not been a

---

[21] Plaintiff has two separate credit cards with First Premier Bank. She lists the monthly expense on these cards at $85 and $40 respectively. Plaintiff's monthly expense on her Costco credit card is listed at $100 and her US Bank credit card is listed at $175.

[22] Plaintiff listed this monthly expense as $87 in Exs. 139 and 140, but proposed at trial to reduce it to $37.

MEMORANDUM OF DECISION - 25

profitable venture, and Plaintiff's choice to finance its operations in large part with credit cards was a poor one at best.  Simply put, the continued existence of Firebug Designs is not necessary for Plaintiff to maintain a minimal standard of living.[23]  While the business may provide some enjoyment and personal satisfaction to Plaintiff, and an opportunity for her to work with her daughter, it amounts to little more than a drain on her pocketbook.  In deciding whether to discharges thousands of dollars in educational loans, the Court is unwilling to allow Plaintiff to continue to subsidize a nonprofitable enterprise.  Thus, to the extent Plaintiff's out-of-pocket expenses have not yet been incurred, they will be excluded from her budget.

The accrued credit card debt associated with the business is a different matter, however.  Those debts have already been incurred, and

_____

[23] There was no testimony regarding whether Plaintiff received a salary from Firebug Designs, but the voluminous profit and loss reports do not list one. Ex. 240.  Although individual sales of goods are itemized, the amounts received for each sale are all listed as $0.00.  *Id.* at 74-86, 115-119.  Given these realities, Firebug Designs provides no income stream to Plaintiff, thus its discontinuance will not jeopardize Plaintiff's ability to pay for her necessary expenses.

MEMORANDUM OF DECISION - 26

Plaintiff must repay them or risk collection actions by the creditors,

something which would subject her to undue financial hardship.  Simply

put, Plaintiff is obligated to repay that debt and it can not be ignored in

this analysis.

In summary, taking Plaintiff's claimed expenses, Exs. 139 and 140,

and making the required adjustments reflected above, the Court finds

Plaintiff's allowable net monthly expenses, at least initially, should be

$447.11.

### 3.    Student Loan Payments

Having established appropriate figures for Plaintiff's income and

expenses, the Court next compares her net monthly income to the amount

she would be required to pay on her educational loans to determine

whether Plaintiff can pay those debts while maintaining a minimal

standard of living.

ECMC represents, and Plaintiff has not challenged, that she has four

student loan repayment options under the William D. Ford Direct Loan

Program: standard, extended, graduated, and income contingent.  *See* 34

MEMORANDUM OF DECISION - 27

C.F.R. 685.208(f).  In its post-trial brief, ECMC explained that Plaintiff's

monthly payment under the income contingent repayment plan ("ICRP")

would be $489.40,[24] and her payment under the graduated plan would be

$369.90.  Figures for the standard and extended repayment options were

not offered into evidence by ECMC, although the Court presumes the

monthly payments would be substantially more than the other options.

For the purposes of the analysis, the Court will use the ICRP figure

supplied by ECMC, because it best reflects Plaintiff's need for flexibility

depending upon her potentially changing future income and expenses.

Starting with a gross income of $4,940, and deducting the expenses

Plaintiff projects, as modified by the Court, Plaintiff has net income of

$447.11 per month to use for student loan payments.  Accordingly,

comparing this figure with the required payment under the ICRP of

$489.40, the Court finds that Plaintiff is unable to make the full monthly

ICRP payment while meeting her other necessary expenses.  Based upon

---

[24]  This figure is based on Plaintiff's 2007 adjusted gross income of $39,764.
*See* Ex. 206.  Presumably, the minimum payment under this program would be
higher if Plaintiff's income is also a larger amount.

MEMORANDUM OF DECISION - 28

these findings, the Court concludes Plaintiff has satisfied the first prong of

the *Brunner* test, and that she cannot maintain, based on current income

and expenses, a minimal standard of living if she is required to repay the

loans in full.

      **B.**    **Additional Circumstances**

      Under *Brunner's* second prong, Plaintiff must prove "that her

present inability to pay will likely persist throughout a substantial portion

of the loan's repayment period." *Educ. Credit Mgmt. Corp. v. Nys (In re*

*Nys)*, 446 F.3d 938, 945 (9th Cir. 2006) (citing *In re Pena*, 155 F.3d at 1114).

The Ninth Circuit explained that bankruptcy courts should endeavor to

identify whether "additional circumstances" exist to support this finding,

but clarified that "the determinative question is whether the debtor's

inability to pay will, given all we know about the salient features of her

existence, persist throughout a substantial portion of the loan's

repayment." *Id.* at 946.

      In *Nys*, the Ninth Circuit referred to a non-exhaustive list of possible

"additional circumstances" which the B.A.P. had identified in its

MEMORANDUM OF DECISION - 29

underlying decision.  *See Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 308

B.R. 436, 446-67 (9th Cir. B.A.P. 2004).  The list includes, *inter alia*,

examining whether the debtor has maximized her income potential and

whether she has more lucrative job skills; whether the debtor has a limited

number of years remaining in her work life; whether the debtor's age or

other factors prevent retraining or relocation as a means of repaying the

loans; whether the debtor lacks other assets which could be used to repay

the loan; and whether the debtor lacks better financial options elsewhere.

*Id* at 447.  At trial, Plaintiff pointed to many "additional circumstances"

applicable in her case.

     Although it is true Plaintiff earns more now than she ever has, her

income is not likely to increase substantially between now and the time

she retires.  The manager of RGP testified that Plaintiff's hourly wage was

currently at market level, and offered no guarantees of future increases.  In

addition, Plaintiff's attempts to secure other employment within the

agricultural economics field have proved unsuccessful.  All things

MEMORANDUM OF DECISION - 30

considered, the Court finds that Plaintiff has maximized her income potential.

As previously mentioned, Plaintiff is sixty years old, thus age is an important factor in this analysis. Any efforts by Plaintiff to obtain additional job training to improve her earning potential would likely be fruitless for several reasons. First, time she spends retraining would likely hinder Plaintiff's ability to work full-time, thus decreasing her current income. Any increase in income could very well be offset by the fact that she will be commensurately closer to retirement age. In addition, given Plaintiff's current financial situation, any retraining or additional education would likely need to be financed with loans, exacerbating the current predicament.

Plaintiff testified that she hopes to continue working until she reaches age sixty-six. Obviously, many adults are able to continue working well beyond that age. But given Plaintiff's medical condition, it is reasonable to assume that Plaintiff's working days are numbered. When Plaintiff does retire, her income will substantially decrease. Based upon

MEMORANDUM OF DECISION - 31

her social security statement, if Plaintiff continues to work until age sixty-six, her monthly benefit would be approximately $1,677. Ex. 138. In addition to this amount, Plaintiff will receive a small pension payment from Boise Cascade of approximately $200 per month. Although the Court cannot accurately predict how much Plaintiff will have available from her other retirement savings, given the relatively brief time until she retires, it appears any monthly distributions from her retirement account will be relatively small. Realistically viewing the evidence, it will be a challenge for Plaintiff to meet her necessary living expenses upon retirement, let alone to pay her student loans.[25]

Plaintiff lacks significant assets other than her current income with which to pay her student loans, and no better financial options are available to Plaintiff elsewhere. Plaintiff is ill, and her health could deteriorate in the future. Plaintiff is sixty years old, and she will be able to

---

[25] The Court notes that even after omitting all automatic deductions and withdrawals from her paycheck - expenses that presumably will not exist after retirement - Plaintiff's necessary expenses still total in excess of $2,500. Moreover, many of these expenses are likely to increase in the future.

MEMORANDUM OF DECISION - 32

work only a limited number of years.  Based upon these and other "additional circumstances" shown to exist in Plaintiff's case, the Court finds that Plaintiff's current inability to make a full monthly student loan payment would persist throughout a substantial portion of any required repayment period.

### C.    Good Faith

The final prong of the *Brunner* test focuses on a debtor's good faith in making efforts to repay the student loans.  To determine whether a debtor has exhibited good faith, a bankruptcy court may consider whether a debtor has attempted to obtain employment, maximize income, and minimize expenses.  *In re Mason*, 464 F.3d at 884; *In re Birrane*, 287 B.R. at 499.  In addition, courts may consider a debtor's efforts to negotiate a repayment plan or seek forbearance or deferments.  But, "a history of making or not making payments is, by itself, not dispositive."  *In re Mason*, 464 F.3d at 884.

This is not the case where the debtor immediately upon graduation sought refuge in bankruptcy court to discharge her student loans.  To the

MEMORANDUM OF DECISION - 33

contrary, Plaintiff has engaged in substantial efforts to repay her

educational debts.

The evidence shows that since Plaintiff graduated, she has struggled

to make ends meet.  On multiple occasions, when the circumstances

warranted it, she has requested and been granted deferments and

forbearances by the student loan creditor or its agents.  *See* Exs. 209-215.

While she sought accommodations on many occasions, Plaintiff testified

that she also made payments on these debts both before and after she

consolidated her loans.  This is confirmed by Ex. 135, which shows over

forty payments received by the creditor, several of which came after her

consolidation in 2001.[26]

The Court discussed above Plaintiff's efforts to obtain employment

and maximize her income.  While some of the expense items on Plaintiff's

proposed budget are, in the Court's opinion, not strictly necessary for her

to maintain a minimal standard of living, they are by no means

---

[26]  These are not token payments, but represent a significant effort to repay
the loans.  Over a third of these payments were in excess of $600.

MEMORANDUM OF DECISION - 34

extravagant, nor does the Court detect any attempt by Plaintiff to shirk her

responsibility to the creditor.  Based upon all the evidence, in the exercise

of its discretion, the Court finds and concludes that Plaintiff has made a

good faith effort to repay her student loans.

### D.    Partial Discharge

Historically, though recognizing that other bankruptcy courts

allowed for the partial discharge of student loans, the Ninth Circuit B.A.P.

had held that § 523(a)(8) did not authorize a partial discharge of student

loans.  *See United Student Aid Funds Inc. v. Taylor (In re Taylor)*, 223 B.R. 747,

753 (9th Cir. B.A.P. 1998).  However, the Ninth Circuit rejected the "all-or-

nothing" approach to discharge of student loans set forth in *Taylor*, and

confirmed that "bankruptcy courts may exercise their equitable authority

under 11 U.S.C. § 105(a) to partially discharge student loans."  *Saxman v.*

*Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.2d 1168, 1173 (9th Cir. 2003).

The court cautioned, however, that the power to authorize a partial

discharge of educational debts under § 105(a) does not empower the

bankruptcy courts to engage in arbitrary acts of beneficence, as § 523(a)(8)

MEMORANDUM OF DECISION - 35

permits discharge only if a debtor first proves that repayment of the full

loan balance imposes an undue hardship: "Unless the court first ensures

itself that the debtor has met the requirements under § 523(a)(8), the

court's discretionary use of its equitable authority amounts to an

impermissible 'roving commission to do equity.'" *Id*. at 1175 (quoting

*United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986)).  In obedience to

the case law, "before [a] bankruptcy court can partially discharge student

debt pursuant to § 105(a), it must first find that the portion being

discharged satisfies the requirements under § 523(a)(8)." *Id.*

Though praising the *Saxman* decision for giving "an important

clarification" regarding student loan dischargeability, this Court has

previously noted that the decision was somewhat problematic, in that it

fails to establish "any practical guidance to the bankruptcy court

concerning *how* to craft a partial discharge." *Mason v. Help Servs. Group,*

*Inc. (In re Mason)*, 04.1 I.B.C.R. 5, 6 (Bankr. D. Idaho 2004), *rev'd on other*

*grounds*.  Given the lack of clear standards for granting partial discharges

MEMORANDUM OF DECISION - 36

in the Ninth Circuit, the Court observed that "much is left to the discretion

of the bankruptcy court."  *Id.*

Here, the Court's analysis of Plaintiff's income and expenses show

she has some funds available each month that could be used to pay a

portion of her educational debt.  On the other hand, as noted above,

Plaintiff has satisfied the *Brunner* test, and she can not repay the full

amount due on the student loans.  The critical issue thus becomes, how

much relief via discharge should Plaintiff be afforded under these facts?

Several factors are key in determining how to grant Plaintiff

"effective, but appropriately limited relief."  *Id.*  First, though not able to

make the full monthly payment due under the ICRP, Plaintiff currently

has the ability to make a substantial payment and still maintain a minimal

standard of living.  Second, Plaintiff's age and medical condition pose an

ongoing concern.  Given the realities of her condition and the likelihood

that her health will continue to decline, the Court finds it reasonable to

assume that Plaintiff will not be able to continue working full-time beyond

her sixty-sixth birthday.  And when Plaintiff does retire, her reduced

MEMORANDUM OF DECISION - 37

income will not allow her to make any payments on her student loans

without enduring undue hardship.

Under these circumstances, in the exercise of its discretion as

allowed by § 105(a), the Court concludes that a portion, but not all, of

Plaintiff's student loan debt should be discharged.  Based upon the Court's

adjustments to Plaintiff's proposed budget, she currently has

approximately $447 each month available to service her education debts.

The Court concludes that Plaintiff should expect to commit this entire

amount each month to the repayment of her student loans for the next 60

months, until she reaches an appropriate retirement age.  Moreover, if

Plaintiff continues to make the payments on her business credit cards as

listed in her budget, she will eventually pay off the balances due, resulting

in additional disposable income which she should then commit to the

repayment of her student loans.[27]  Using this approach, Plaintiff should

---

[27] According to the Court's calculations, the First Premier Bank card with the lower balance will be paid in full in fourteen months, and the other First Premier Bank card will be paid in full in sixteen months.  The Costco card will be paid in full in twenty-seven months.

MEMORANDUM OF DECISION - 38

justifiably be expected to pay, over 60 months, a total of $35,700 on her

student loans.[28]  The Court will therefore grant Plaintiff a partial discharge

as to all ECMC debt in excess of that amount.

## Conclusion

Plaintiff has shown that she would suffer an undue hardship, as

measured by the *Brunner* test, if she were required to repay the total

amount due on her student loans.  However, the Court concludes that

Plaintiff is able to repay a portion of her student loans, and that consistent

with *Saxman*, entry of a partial discharge of Plaintiff's student loan

obligation by the Court will best implement the policies of the Bankruptcy

Code in this context.  In the exercise of the Court's equitable powers under

§ 105(a), the Court concludes $35,700 of the educational debt should be

---

[28]  Over the next 60 months, the amount of Plaintiff's income available
monthly to pay student loans, in the Court's view, is as follows:  months 1
through 14 - $447; months 15 through 16 - $487; months 17 through 27 - $572;
months 28 through 60 - $672.

MEMORANDUM OF DECISION - 39

excepted from discharge.  All debts owed to ECMC in excess of that

amount should be discharged.[29]

Counsel for Plaintiff shall promptly submit an appropriate form of

judgment consistent with this decision, which has been approved by

counsel for ECMC, for entry by the Court.

Dated:  June 6, 2008



_____
Honorable Jim D. Pappas
United States Bankruptcy Judge

_____

[29]  While this decision establishes the total amount of nondischargeable
debt.  One possible payment plan is suggested above in n. 26.  However, the
parties are free, and indeed are encouraged, to negotiate an appropriate
payment arrangement, provided the total to be repaid by Plaintiff to ECMC is
consistent with this Memorandum.

MEMORANDUM OF DECISION - 40

MEMORANDUM OF DECISION - 41